IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHRISTOPHER A. MUSTARD, et al.,

            Civil Action No. 21-cv-163 (BAH)

 Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN,

 Defendant.

_____/

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR ENTRY OF DEFAULT JUDGMENT
AND TO TAKE JUDICIAL NOTICE OF EVIDENCE IN PRIOR RELATED CASES**

   This case arises out of the July 25, 1996 terrorist bombing attack against the United States Air Force Base in Dhahran, Saudi Arabia. This was the "Khobar Towers" terrorist attack, named after the residential complex where service members were housed (the "Attack"). The Attack was materially supported and planned by Defendant the Islamic Republic of Iran. Nineteen American service members were killed in the Attack, and many others were injured.

   Plaintiff, Christopher Mustard, was among the service members injured in the Attack. Plaintiff, Susanne Ceragioli, is the sister of Denny Prier, a Senior Airman who was injured in the Attack. In *Aceto v. Islamic Republic of Iran*, 2020 WL 619925 (D.D.C. 2020) (Howell, C.J.), this Court awarded damages to Denny Prier and to the parents and sister of Ms. Ceragioli for Denny's injuries and for his family members' pain and suffering. Plaintiffs Pauline Wilder, William Wilder, Jeffrey Wilder, and Kristene Wilder are the parents and siblings of Jennifer Scheidel, a Senior Airman to whom this Court awarded damages for her injuries in *Aceto v. Islamic Republic of Iran*, 2020 WL 619925 (D.D.C. 2020) (Howell, C.J.).

## I.     Plaintiffs Have Properly Served Iran and It Has Failed To Appear and Is in Default.

Plaintiffs have complied with all requirements for service on Defendant the Islamic Republic of Iran under 28 U.S.C. Section 1608(a), which provides for service on a foreign sovereign and its political subdivisions in one of four ways. The first two, by (1) "special arrangement for service between the plaintiff and the foreign state," and (2) "in accordance with an applicable international convention on service of judicial documents," are inapplicable here.[1] Section 1608(a)(3), requiring attempted service "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," was attempted here. ECF No. 8 (affidavit requesting foreign service pursuant to 28 U.S.C. § 1608(a)). However, service under subsection (a)(3) was not successful. ECF. No. 9 (Clerk's Notice of inability to serve).

If service cannot be made pursuant to any of the first three subdivisions of Section 1608(a), after the lapse of at least 30 days, subdivision (a)(4) of that provision authorizes "diplomatic service" by requesting the Clerk of the Court to send two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when papers were transmitted." After the lapse of more than 30

---

[1] This Court has repeatedly so held. E.g., *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 78 (D.D.C. 2017) (BAH) ("Defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service….").

days, the Clerk in this case transmitted the required papers to the United States State Department. ECF No. 12. On November 23, 2021, the State Department sent to the Clerk of the Court a letter and Certification of Diplomatic Note attesting to the August 2, 2021 service of the required papers through diplomatic channels pursuant to 28 U.S.C. 1608(a)(4). ECF No. 14. Thus, Iran was properly served in this action.

Pursuant to 28 U.S.C. Section 1608(d), defendants had sixty days after service was effected "to plead or otherwise defend" this action. See Fed. R. Civ. P. 55(a). Iran's time to do so expired, and the Clerk of the Court entered default against Iran on December 23, 2021. DE 16.

## II.     The Court May Assert Personal Jurisdiction Over Iran.

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction … where service has been made under Section 1608 of this title." 28 U.S.C. § 1330(b); *Estate of Hirshfeld, 330 F. Supp. 3d at 136-137* (personal jurisdiction under the FSIA established by subject matter jurisdiction plus valid service of process). "In other words, 'under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction.'" *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012), quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002). Moreover, "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" *Price* 294 F.3d at 87 (foreign states are not "persons" entitled to due process).

Because Defendant, Iran, was properly served with this action, and as discussed below, this Court has subject matter jurisdiction, the Court may assert personal jurisdiction over Iran.

## III.    The Court May Take Judicial Notice of Evidence Establishing the Same Defendant's Liability for the June 25, 1996 Terrorist Attack on the Khobar Towers.

This action arises out of the terrorist attack on June 25, 1996, on the Khobar Towers apartment complex in Dhahran, Saudi Arabia.  All Plaintiffs' claims arise from that same single terrorist bombing attack.

This Court has already found defendant liable for the same terrorist attack in several prior decisions: *See e.g.*, *Blais et al. v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006); *Estate of Heiser et al. v. Islamic Republic of Iran,* 466 F. Supp. 2d 229 (D.D.C. 2006); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.2d 163 (D.D.C. 2010); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888 (D.D.C. 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273 (D.D.C. 2020) (Howell, C.J.).

In *Blais* and *Estate of Heiser*, the Court heard extensive evidence, including expert testimony, and held that Iran was liable for the same June 25, 1996, terrorist attack on the Khobar Towers at issue in this case. "In *Heiser I* alone, the evidentiary hearing took seventeen days and included examination of witnesses, including seven expert witnesses." *Blank v. Islamic Republic of Iran*, No. CV 19-3645 (BAH), 2021 WL 3021450, at *1 (D.D.C. July 17, 2021). In *Blank* (*id.* at n. 2), this Court recounted the extensive scope of the expert testimony presented in *Heiser*:

> The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"), *Heiser I*, 466 F. Supp. 2d at 252–53, 260–62; (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism, *id.* at 253–54, 262; (3) Dr. Bruce Tefft, a founding member of the Central Intelligence Agency ("CIA") Counterterrorism Bureau and regular consultant on issues of terrorism, *id.* at 253–54, 263–64; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *id.* at 253, 262; (5) Dr. Thomas Parsons, a medical examiner, *See id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *See id.* at 269–70, 275, 280, 283, 285–86, 288–91, 293, 295, 297–303, 308, 310–12, 314, 316–18, 322–27, 330, 332, 335–36, 339–45,

347–51, 353–55; and (7) Dr. Herman Miller, an economic consultant, *id.* at 273–74, 282, 288, 290, 292, 300, 307, 313–14, 320–21, 330, 334, 338.

In the *Rimkus* case, the court took judicial notice of the findings in *Blais* and *Heiser* to impose liability on Iran for the Attack. Iran defaulted and did not appear in the *Blais*, *Heiser, Rimkus, Akins, Aceto, Schooley, Christie,* or *Blank* cases, just as it has defaulted and refused to appear in this case. Plaintiffs here are similarly situated in all respects to the plaintiffs in those cases. ***Indeed, all Plaintiffs except for Christopher Mustard, who was himself, injured in the attack, are close relatives of Plaintiffs who successfully pursued their claims in the Aceto case***[2].

Fed. R. Evid. 201 authorizes the Court to take judicial notice of facts previously determined by the court in circumstances such as those presented here. "It is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." *Veg-Mix Inc. v. U.S. Dept. of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987) (citations omitted). The Court held in *Heiser* that "a court may take judicial notice of related proceedings and records in cases before the same court." *Heiser*, <u>supra</u>, 466 F. Supp. 2d at 262-63, <u>quoting</u> *Salazar v. Islamic Republic of Iran*, 370 F. Supp.2d 105, 109 n.6 (D.D.C. 2005).

In *Blank*, this Court explained the applicability of judicial notice in FSIA terrorism cases. *Blank*, 2021 WL 3021450, at *2. It held that while judicial notice "does not conclusively establish the facts found in those cases," it permits courts in subsequent related cases to "reach their own independent findings of fact." *Id*. (citations omitted). The court also recognized that the D.C. Circuit has endorsed this procedure in FSIA terrorism cases. *Id*, citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014).

---

[2] Plaintiffs request that the Court take judicial notice of the evidence underlying its findings in *Aceto* regarding the injuries to *Aceto* Plaintiffs Denny Prier and his family and to Jennifer Scheidel. <u>See</u> *Aceto*, Civ. No. 1:19-cv-464, ECF No. 24-1 at 13-20 (Declaration of Jennifer Scheidel), 65-83 (Declarations of Denny Prier, Vicki Prier, Thomas Prier, Monika Prier, and Tene Woods). *Aceto* ECF No. 24-1 is being re-filed herewith.

The Court has recognized the appropriateness of taking such judicial notice and entering default judgments as to liability in subsequent cases involving the same terrorist incidents previously adjudicated against the same defendants in default. *E.g.*, *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 103 (D.D.C. 2007); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50-51 (D.D.C. 2009) ("this Court may take judicial notice of related proceedings and records in cases before the same court.") *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010) ("the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence"); see also *Murphy v. Islamic Republic of Iran,* No. 06-cv-596 (D.D.C. Oct. 2, 2007); *Estate of Anthony K. Brown v. Islamic Republic of Iran*, No. 08-cv-531 (D.D.C. Feb. 1, 2010).

In *Rimkus,* the Court concluded that judicial notice of findings in the *Heiser* and *Blais* cases would be appropriate because "the history of litigation stemming from the bombing of Khobar Towers … is extensive." 750 F. Supp.2d at 167. The Rimkus court continued:

> Over years of litigation, the plaintiffs in both *Blais* and *Heiser* presented substantial evidence to the Court concerning the Khobar Towers bombing. In *Blais,* the plaintiffs submitted evidence concerning the investigations and opinions of Louis Freeh and Dale Watson. Mr. Freeh was the FBI Director at the time of the bombing, and under his direction the FBI "conducted a massive and thorough investigation of the attack, using over 250 agents." *Blais,* 459 F. Supp. 2d at 48. Mr. Watson was the Deputy Counterterrorism Chief of the FBI in 1996, and subsequent to the attack he became the Section Chief for all international terrorism at the Bureau. He was responsible "for day to day oversight of the FBI investigation" and has given sworn testimony concerning the results of the investigation. *Id.*750 F. Supp.2d at 168.

The *Rimkus* opinion further detailed the evidence it judicially noticed from *Blais* and *Heiser* for holding defendants liable for the Khobar Towers terrorist attack:

> In addition, Dr. Bruce Tefft, "one of the founding members of the CIA's counterterrorism bureau" and expert consultant on terrorism-related issues, was qualified as an expert and gave extensive testimony concerning the defendants' involvement in terrorist activities. *Id.* at 48-49. In *Heiser,* the evidence was even more extensive than in

*Blais,* and was presented to a magistrate judge over the course of more than two weeks. *Heiser I,* 466 F. Supp. 2d at 250.

....

Based on all of the above evidence, as well as additional documentary and testimonial submissions, the Court in both *Blais* and *Heiser* concluded that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hizbollah to execute the plan… *Id.* at 265; *Blais,* 459 F. Supp. 2d at 48 (quoting with approval Dr. Tefft's conclusion that defendants "were responsible for planning and supporting the attack on the Khobar Towers").

750 F. Supp.2d at 168 (footnote omitted).

Accordingly, Plaintiffs' motion asking the Court to take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran for providing material support and resources to the terrorists who attacked the Khobar Towers complex on June 25, 1996, is well-supported.

The evidence submitted to, and relied upon by, the courts in the prior cases involving the Khobar Towers attack supports a finding that Iran is subject to the Court's subject matter jurisdiction and that it is liable for the Plaintiffs' claims herein. *Aceto v. Islamic Republic of Iran*, No. CV 19-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (case involving injuries to close relatives of Plaintiffs herein).

### IV. The Plaintiffs' Declarations and Those of Their Relatives Previously Filed in the *Aceto* Case Support their Right to Entry of Judgment.

Plaintiffs submit herewith sworn declarations supporting their right to entry of judgment. Plaintiffs also file herewith copies of the plaintiffs' declarations filed in the *Aceto* case, including those filed by the close family members of several Plaintiffs herein. See ECF No. 24-1, *Aceto v. Islamic Republic of Iran*, Case No. 1:19-cv-464 (BAH).  In particular, Plaintiffs refer the Court to the following Declarations from *Aceto* (all of which are filed herewith):

- Declaration of Plaintiff Jennifer Scheidel, *Aceto*, ECF No. 24-1 at 13-20, in support of the claims of Plaintiffs Pauline, William Curtis, Jeffrey Curtis, and Kristene Wilder;

- Declaration of Plaintiff Denny Prier, *Aceto*, ECF No. 24-1 at 65-72, in support of the claim of Plaintiff, Susanne Ceragioli;

- Declaration of Plaintiff Vicki Prier, *Aceto*, ECF No. 24-1 at 73-75, in support of the claim of Plaintiff, Susanne Ceragioli;

- Declaration of Plaintiff Thomas Prier, *Aceto*, ECF No. 24-1 at 76-78, in support of the claim of Plaintiff, Susanne Ceragioli;

- Declaration of Plaintiff Monika Prier, *Aceto*, ECF No. 24-1 at 79-80, in support of the claim of Plaintiff, Susanne Ceragioli;

- Declaration of Plaintiff Tene Woods, *Aceto*, ECF No. 24-1 at 81-73, in support of the claim of Plaintiff, Susanne Ceragioli.

This Court has held that sworn declarations such as those submitted by plaintiffs herewith are sufficient to satisfy the requirement of the FSIA, 28 U.S.C. Section 1608(e), that a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court."  E.g., *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), citing, *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) and *Weinstein v. Islamic Republic of Iran* 184 F. Supp. 2d 13 at 19 (D.D.C. 2002). This Court has endorsed that view as well. *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 74-75 (D.D.C. 2017) (BAH).See also *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (BAH); *Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888 (D.D.C. 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020) (Howell, C.J.);

*Christie v. Islamic Republic of Iran*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273 (D.D.C. 2020)(Howell, C.J.). The United States Court of Appeals for the D.C. Circuit has held that section 1608(e) "does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *O w e n s   v .   Republic of Sudan,* 864 F.3d 751, 785 (D.C. Cir. 2017), *rev'd on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

Additionally, under Fed. R. Evid. 201, the Court may consider the declarations submitted by relatives of the Plaintiffs in the *Aceto* case. "It is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." *Veg-Mix Inc. v. U.S. Dept. of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987) (citations omitted); see also, *Heiser*, *supra*, 466 F. Supp. 2d at 262-63, *quoting Salazar v. Islamic Republic of Iran*, 370 F. Supp.2d 105, 109 n.6 (D.D.C. 2005).

Plaintiffs note that in *Maalouf v. Islamic Republic of Iran*, 923 F. 3d 1095, 1113 (D.C. Cir. 2019), the D.C. Circuit squarely held that a defendant that does not appear (as here) cannot benefit from a statute-of-limitations defense: A district court may not "act *sua sponte* to raise affirmative defenses on behalf of defendants who do not appear to defend actions against them."

### V.    All Plaintiffs Have Suffered Physical and Psychological Injuries and May Bring their Claims under Section 1605A and Common Law.

The state-sponsored terrorism exception provides a private right of action. The action is available to, among others, nationals of the United States and the legal representatives of such persons. 28 U.S.C. § 1605A(c). Foreign states that meet subsection (a)(2)(A)(i)'s requirements as "state sponsors of terrorism" may be held liable under subsection (c) "for personal injury or death" caused by the foreign state or its agents. *Id*. "In any such action damages may include economic damages, solatium, pain and suffering, and punitive damages." *Id*.

It is well established that Iran is now, and has continuously been since 1984, a state sponsor of terrorism. Iran was designated by Secretary of State George P. Shultz on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz). This designation meets section 1605A's definition of "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Iran continues to be designated as a state sponsor of terrorism to this day. *State Sponsors of Terrorism,* U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited March 30, 2022).

Although Section 1605A(c) provides a private right of action, it does not itself specify the substantive law to be applied. This Court has therefore applied "general principles of tort law," looking to authoritative sources such as the Restatement (Second) of Torts. See, e.g., *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014). These cases have repeatedly and correctly held that, under any possible interpretation of these general principles, a state sponsor of terrorism which is shown to have provided material resources and support to a terrorist organization for an attack that causes an "extra-judicial killing" and/or "personal injury" is responsible for intentional infliction of emotional distress and the pain and suffering of the immediate family of the deceased as well as loss of consortium and solatium[3].

Thus, courts have found that 1605A(c) allows claims for a wide range of causes of action including wrongful death, battery, assault, solatium. solatium/intentional infliction of emotional distress (IIED), and civil conspiracy, among others. See e.g., *Gill v. Islamic Republic of Iran*,

---

[3] "Under the FSIA, a solatium claim is indistinguishable from" a claim for intentional infliction of emotional distress. *Valore v. Islamic Republic of Iran*, 700 F. Supp 2d at 85.

249 F. Supp. 3d 88, 101 (D.D.C. 2017) (civil conspiracy, assault, battery). *Selig v. Islamic Republic of Iran*, No. 1:19-CV-02889-TNM, -- F.Supp.3d --, 2021 WL 5446870, at \*12 (D.D.C. Nov. 22, 2021) (wrongful death, solatium and IIED); *Borochov v. Islamic Republic of Iran*, No. 1:19-CV-02855 (TNM), 2022 WL 656168, at \*10 (D.D.C. Mar. 4, 2022) (battery, assault, IIED/solatium); *Schooley v. Islamic Republic of Iran*, No. CV 17-1376 (BAH), 2019 WL 2717888, at \*71 (D.D.C. June 27, 2019) (same); *Blank v. Islamic Republic of Iran*, 2021 WL 3021450, at \*9 (D.D.C. July 17, 2021) (quotation marks and citations omitted).

In *Akins v. Islamic Republic of Iran*, supra, this Court held that Iran was liable to the service members who were present at the Khobar Towers attack for the torts of assault, battery, and intentional infliction of distress. 332 F. Supp. 2d at 37. The Court also held Iran liable to the close family members of those present for intentional infliction of emotional distress, with rights to solatium damages expressly mentioned in Section 1605A(c). *Id*. at 38.

All of the Plaintiffs are U.S. nationals and may therefore maintain their claims under 28 U.S.C. § 1605A(c)[4], the FSIA's statutory cause of action for terrorism claims against designated state sponsors of terrorism, such as Iran. See Plaintiffs' Declarations in Support of Default Judgment and exhibits thereto. ECF No. 24. "There is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86 (D.D.C. 2018), *quoting*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017).  Thus, "a plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law." *Fritz*, 320 F. Supp. 3d at 86; *Karcher*

---

[4] Plaintiff Susanne Ceragioli is, and was at the time of the Attack, a U.S. national. Because the facts relating to her status as a U.S. national differ from the other plaintiffs, her claim is discussed separately below.

*v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C. 2019) (same); *Sotloff v. Syrian Arab Republic*, No. 18-CV-1625, 2021 WL 965882 (D.D.C. Mar. 15, 2021) (same).

Iran's conduct renders it liable to Plaintiff Christopher Mustard under § 1605A(c) based upon several theories of liability, including assault, battery, and intentional infliction of emotional distress/solatium (IIED). See e.g., *Akins v. Islamic Repub. of Iran*, 332 F. Supp. 3d 1, 35–37 (D.D.C. 2018) (Iran liable to victims of Khobar Towers attack under theories of assault, battery, and IIED). Iran is liable to the remaining Plaintiffs under § 1605A(c) based upon intentional infliction of emotional distress/solatium. *See e.g. id.*, at 38 (citations omitted) (Iran liable to family members of victims of Khobar Towers attack for IIED).

**VI.     Plaintiffs are Entitled to Compensatory Damages**.

The Plaintiffs' Declarations and those filed by their relatives in the *Aceto* case establish the damages suffered by each Plaintiff. In assessing the appropriate measure of damages to award, "[m]any judges in this district have adopted the amounts awarded to the plaintiffs in *Heiser* as a baseline from which variances are applied case-by-case." *Selig v. Islamic Republic of Iran*, No. 1:19-CV-02889-TNM, -- F.Supp.3d --, 2021 WL 5446870, at *13 (D.D.C. Nov. 22, 2021). *Id*. "Calculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016). This baseline amount may deviate upward, "in the presence of severe instances of physical and psychological pain ... or downward" were the victim suffers only minor injuries. *Id*.

Courts have also established precedents for solatium awards for close relatives of victims. Under *Heiser* and its progeny, relatives of terrorism victims start with baseline solatium awards that are roughly half the amounts awarded to close relatives of deceased victims. See e.g., *Wultz*

12

*v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012). Thus, in this case, the applicable baseline solatium awards for the Wilder and Ceragioli Plaintiffs is $2,500,000 to parents of surviving victims, and $1,250,000 to siblings of surviving victims. See *Aceto*, 2020 WL 619925 at *21 (citations omitted).

### A. Christopher Mustard.

Plaintiff, Christopher Mustard, was an Airman, First Class, who was present in a Khobar Tower residence at the time of the attack. Decl. Mustard at ¶ 4. He was injured by the blast and by shattered glass that lacerated his body. Decl. Mustard at ¶ 9. He had so many shards of glass in his body that up to one year after the Attack, he would occasionally pull another piece of glass out of his own back. Decl. Mustard at ¶ 9. He required assistance to evacuate the building. Decl. Mustard at ¶ 5-6, 8. Mr. Mustard was further traumatized when, together with other survivors who had gathered in a courtyard, he saw lights in the sky and believed that they were under a rocket attack. Decl. Mustard at ¶ 7. The following day, Mr. Mustard was among those tasked with loading the remains of the deceased onto aircraft. Decl. Mustard at ¶ 10. These horrific experiences further traumatized Mr. Mustard.

In addition to his physical injuries, Mr. Mustard suffered, and continues to suffer from memory loss, nightmares, and flashbacks. Decl. Mustard at ¶ 13, 14. When he would hear loud noises, Mr. Mustard would break down crying and to go into shock. Decl. Mustard at ¶ 21. Mr. Mustard reports that for approximately 8-10 years he dealt with the trauma every single day. Decl. Mustard at ¶ 15. He asked himself, "What does G-d want from me?" Decl. Mustard at ¶ 16.

Today, he reports that if he prepares himself, he is able to tolerate loud noises with difficulty. But, if he is not prepared, loud noises disturb him terribly. Decl. Mustard at ¶ 22.  Mr.

Mustard has become very guarded in social situations. He has difficulty trusting people, and only truly trusts a handful of people, all of whom are close relatives.

Mr. Mustard was awarded the Purple Heart in recognition of his injuries in the Attack. Moreover, he has a combined disability rating of 100%. The documentation provided does not indicate what percentage of his disability is attributable to his injuries in the Khobar Towers Attack. See Decl. Mustard and attachments.

In other cases, injured servicemembers who were rated in the 70% to 100% disability range have been awarded damages for pain and suffering of $7,000,000. See e.g., *Schooley*, 2019 WL 2717888 at *75 (relying on an "objective metric" to determine the relative degree of injury); See also, *Aceto*, 2020 WL 619925 at *18 (same). Under this objective metric, Mr. Mustard should be awarded damages for pain and suffering of $7 million.

Alternatively, if the Court believes that the lack of clarity regarding which elements of Mr. Mustard's 100% disability rating are attributable to the Attack, at the very least, the Court should award Mr. Mustard compensatory damages consistent with the $5 million baseline award granted to other injured servicemembers. See e.g., *Schooley*, 2019 WL 2717888 at *75 (awarding $6 million each to servicemembers having disability ratings of 40-60% and $5 million each to servicemembers having disability ratings below 30%).

### B. The Wilder Family.

Pauline and William Wilder are the parents of Jennifer Scheidel, who was a servicemember-victim of the Attack. Decl. Pauline at ¶ 4, 5; *Aceto*, 2020 WL 619925. William Wilder is a Vietnam veteran. He served in military intelligence and was exposed to, and injured by, Agent Orange. As a result of his experiences in Vietnam, he continues to suffer from Post

Traumatic Stress Disorder (PTSD). Decl. Pauline at ¶ 6[5]. Jeffrey and Kristene Wilder are Jennifer

Scheidel's brother and sister, respectively. See Decl. Jeffrey at ¶ 4; Kristene at ¶ 4. Jennifer or

"Jenni" suffered severe emotional distress as a result of her experiences during the Attack. *Aceto*

2020 WL 619925. The Attack affected the entire Wilder family and caused Jennifer's parents and

siblings severe emotional distress. Jeffrey ¶ 5.

Pauline and William Wilder heard about the bombing of the Khobar Towers and were

exceedingly distressed and worried about their daughter, Jennifer and her husband, Steven Aceto,

who were both stationed at the Khobar Towers. Decl. Pauline at ¶ 11, 12. They informed Kristene,

who said that upon hearing the news, she was so upset she felt "disconnected from reality and

empty." Kristene at ¶ 6, 8.

The Wilders did not hear from or about their daughter or son-in-law for several hours.

Meanwhile they watched the news and saw the horrific pictures coming out of Dhahran. Decl.

Pauline at ¶ 13, 14. Pauline says her "heart dropped" and she "ached to find out whether Jenni was

safe." Decl. Pauline at ¶ 14.  William's memories of his own life-threatening situations in Vietnam

were reawakened and he imagined his daughter in similar danger. Decl. Pauline at ¶ 13. Kristene

was "very worried" about her older sister and about her entire family. Kristene at ¶ 7-8. Kristene

says:

> It is a strange feeling not knowing if someone you love is alive or dead, and knowing
> there is absolutely nothing you can do to help or find out the truth. I think part of the wall
> that separates Jenni and me started then, when I was not sure whether she was alive or
> dead, injured or not. Kristene at ¶ 7.

Jeffrey heard about the Attack when he received a call from his sister. Jeffrey at ¶ 8. He

became very concerned about Jennifer and says, he "just wanted to hug her and tell her it would

---

[5] More recently, William Wilder developed Parkinson's Disease. Accordingly, Pauline Wilder addresses William's
injuries together with her own. Decl. Pauline at ¶ 7.

be alright." Jeffrey at ¶ 9.  Jeffrey says that even though he did not look at the pictures of the scene of the Attack, he formed in his mind's eye a vivid image of the scene. Jeffrey at ¶ 11. He suffered from nightmares, and "constantly thought about the attack." Jeffrey at ¶ 11.

When the Wilders finally heard that Jenni and Steve had survived the Attack, they were relieved. Having lived for decades with William's PTSD, they were acutely aware that they faced a "rough road ahead" with Jennifer. Decl. Pauline at ¶ 15. Pauline says however, they did not realize just how rough it would be. *Id*.

Jennifer and Steve were required to remain in Dhahran for two more months following the Attack. Pauline at ¶ 16. During this time, there were numerous additional threats of terrorist attacks. *Id*. These threats caused the Wilders distress. *Id*.; Kristene at ¶ 9.  The Wilders also worried about Jennifer's emotional state, having to live in the midst of the destruction that the Khobar Towers had become. Pauline at ¶ 16. Jeffrey wondered whether he would ever see his sister and brother-in-law again. Jeffrey at ¶ 10.

When Jennifer returned to the United States, "she was not herself." Pauline at ¶ 17. She suffered from PTSD and could not cope with the trauma of the Attack. Id. Jennifer "started doing crazy things," "engaged in various forms of destructive behavior and almost committed suicide." Pauline ¶ 17.  Pauline and William had always had a close relationship with their daughter. But when she returned, the relationship became strained. Pauling at ¶ 20.

Jennifer turned to alcohol and drugs. Jeffrey at ¶13; Kristene at ¶ 11. The changes in Jennifer's behavior caused her family indescribable distress. Jeffrey says, "It's impossible to explain all the crazy interactions I had with Jenni and how I felt that my sister and friend had turned into a mean and vindictive person." Jeffrey at ¶14. Kristene says: "[Jennifer] seemed to be spiralling into more anger, more alcohol, more emotional outbursts. I not only was witnessing my

relationship with her dissolve, but I also remember so vividly just wanting to help her and not being able to do so." Kristene at ¶ 12.

The entire Wilder family has suffered severe emotional distress as a result of Jennifer's experience during the Attack and the extreme changes it effected in her and in the relationships she shared with her family. See Jeffrey at ¶¶ 15-17; Kristene at ¶¶ 13-20.

In *Aceto*, this Court awarded damages to Jennifer Scheidel for pain and suffering in the amount of $1.5 million. See *Aceto* at *20. It awarded her an additional $1.5 million in solatium damages based upon the injuries to her then-husband Steven Aceto. *Id*. at *21. Thus, Jennifer Scheidel received a total compensatory award of $3 million.

In *Estate of Bland,* 831 F.Supp.2d at 158, the Court addressed the situation where, due to the nature of a victim's injuries, his award for pain and suffering fell below the baseline award for relatives. Therefore, in *Bland*, the Court held that when a solatium award for a relative would exceed the award received by the surviving victim, the family members' solatium awards should be reduced. *Id*. The court explained that this adjustment prevents the seemingly unjust result in which family members would receive a larger solatium award than the injured servicemember's award. *Id*.; See also *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27–29 (D.D.C. 2014).

Here, because Jennifer Scheidel's was awarded $3 million in compensatory damages, there is no reason to reduce the baseline awards that her family would otherwise receive. Accordingly, the Court should award Pauline and William Wilder compensatory judgments in the baseline amount of $2.5 million each (as parents), and the Court should award Jeffrey and Kristene Wilder compensatory judgments in the baseline amount of $1.25 million each (as siblings).

### C. Susanne Prier Ceragioli

Plaintiff, Susanne Ceragioli, is the oldest sister of Denny Prier, a Senior Airman who was injured in the Attack. See *Aceto* 2020 WL 619925. As a result of Denny Prier's physical and emotional injuries, Ms. Ceragioli has suffered and continues to suffer severe emotional distress. Decl. Ceragioli.

Ms. Ceragioli has always enjoyed a very close relationship with her brother, Denny Prier. Ceragioli at ¶ 8. As children, Susanne would baby sit for Denny and Denny was also very protective of Susanne. Ceragioli at ¶¶ 8-9. Susanne says, "Denny was always so happy and had this quirky, funny little personality that made everyone laugh." Ceragioli at ¶ 10. Even when Denny joined the military, the siblings stayed in touch. Ceragioli at ¶ 15.

On June 25, 1996, Susanne was at work when her mother called her and told her that the Khobar Towers had been destroyed in a bombing attack. Ceragioli at ¶ 17. She immediately took the rest of the day off and went to her parents' house to wait with them for information regarding Denny. Ceragioli at ¶ 18. They saw on the news a photograph of the Khobar Towers building with its face blown off. Susanne was in complete shock and horror. Ceragioli at ¶ 18 ("The memory of that horrible vision will be with me forever").

Throughout the day, the family was unable to obtain any information about Denny. Ceragioli at ¶ 18. The wait was agonizing. Ceragioli at ¶ 22. The family was distraught. Susanne recalls how difficult it was to see her father crying. Ceragioli at ¶ 19. Finally, that night, Denny was able to reach his wife by phone, and she informed the rest of the family that Denny had been injured but that he survived. Ceragioli at ¶ 22. Susanne eventually learned that Denny had been injured in his leg and that he suffered severe emotional trauma. Moreover, Denny's close

childhood friend, Joseph Rimkus was among a number of Denny's friends who were killed in the Attack. Ceragioli at ¶ 23.

Denny was required to remain in Saudi Arabia for approximately two months after the Attack. During this time Susanne was extremely worried about her brother's wellbeing. Ceragioli at ¶ 25. There was a heightened concern that terrorists would carry out additional attacks. *Id*.

When he returned to the United States, he was sent to Omaha, Nebraska for treatment. Ceragioli a ¶ 26. When his parents returned from visiting Denny in Omaha, they told Susanne that he was not himself; he was depressed and very distressed. *Id*. Susanne confirms that after the Attack, Denny changed. He was distant and was no longer cheerful. Ceragioli at ¶ 27. When Susanne would call to speak with Denny, he would hand the phone to his wife to speak. Ceragioli at ¶ 27.

Denny's inability or unwillingness to open up about the Attack distressed Susanne because she knew that talking about it would help him heal. Ceragioli at ¶ 28. Susanne was also distressed over the strain Denny's injuries placed on his marriage. Ceragioli at ¶ 28. Susanne says that Denny continues to suffer from PTSD, which impacts their relationship. Ceragioli at 29. It hurts Susanne to see her little brother continuing to suffer, unable to find relief from the pain and guilt. Ceragioli at ¶ 30-31.

Plaintiff, Susanne Ceragioli, was not born in the United States. She is, however, both a United States citizen and a United States national. See Decl. Ceragioli and attachments. Her biological parents met in Germany where her biological father was stationed while serving in the U.S. military. Decl Monika Prier at ¶ 3, 6, 8; Decl. Susanne Ceragioli at ¶ 3. In 1973, when Susanne was two years old, her mother, Monika Prier married Thomas Prier, who was also a U.S. serviceman. Thomas Prier adopted Susanne in 1975 and is identified as Susanne's father on her

German birth certificate. See Decl. Ceragioli at ¶¶ 4-5 and attachments thereto. Susanne was raised on U.S. military bases and was educated in an American school in Germany until her family moved back to the United States when she was 18 years old. Ceragioli at ¶¶ 12-13. Thus, Susanne has owed permanent allegiance to the United States of America since her early childhood.

Susanne may be treated as a United States national for purposes of 28 U.S.C. 1605A(c) on either or both of the following grounds. *First*, Susanne has been a U.S. citizen since her birth because her biological father was a United States citizen who was physically present in the United States or its outlying possessions for a period not less than five years, at least two of which were after attaining the age of fourteen years. Decl. Monika Prier at ¶ 8; *See* 8 U.S.C. § 1401(g). *Second*, Susanne is a United States national because, even if she were not a U.S. citizen of the United States at the time of the Attack, she has owed permanent allegiance to the United States at all times relevant to this lawsuit. Decl. Ceragioli at ¶¶ 4, 11-13; See *Kim v. Democratic People's Republic of Korea*, 950 F. Supp. 2d 29, 41 (D.D.C. 2013), *rev'd and remanded on other grounds*, 774 F.3d 1044 (D.C. Cir. 2014); *Saludes v. Republica de Cuba,* 577 F.Supp.2d 1243, 1252 (S.D.Fla.2008).

*Additionally*, even if the Court finds that Ms. Ceragioli was not a U.S. national at the time of the Attack, she should be awarded damages under Section 1605A(a) combined with common law claims for intentional infliction of emotional distress/solatium. It is well established that courts may award damages under common law theories of liability even where a non-U.S. national claimant is suing for damages based upon injuries to a close-relative U.S. national victim (such as Denny Prier). *See e.g., Owens,* 864 F.3d at 809; *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138 (D.D.C. 2016) (in enacting the federal cause of action under § 1605A(c), Congress preserved common law and other non-federal causes of action).

In this regard, Plaintiffs note that this Court granted damages under this theory to Ms. Ceragioli's mother, Monika Prier (a German national), in *Aceto* 2020 WL 619925 at *13. There, this Court exercised subject matter jurisdiction pursuant to § 1605A(a), and awarded damages to Monika Prier ("Plaintiff Monika Prier, Denny Prier's mother, is German citizen, but there is jurisdiction over her claims because § 1605A waives immunity where 'the claimant *or the victim*' — *i.e.*, Denny Prier — was "a national of the United States" at the time of the attack."). *Id.* (citations omitted).

In *Aceto*, this Court awarded solatium damages to Ms. Ceragioli's and Denny Prier's parents and sister. *Aceto*, 2020 WL 619925 at *12. Ms. Ceragioli's Declaration demonstrates that she is entitled to solatium damages in the same way that her parents and sister were in *Aceto*. Moreover, half siblings are awarded damages in the same amounts as full siblings. See *Id*. at 16. Accordingly, the Court should award Ms. Ceragioli compensatory damages, a sibling of an injured servicemember, in the same amount awarded to her sister, Tene Woods -- $1,250,000. See *id*. at *23.

### VII.    Plaintiffs are Entitled to Awards of Punitive Damages.

In *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1610 (2020), the Supreme Court decided that punitive damages may be awarded "retroactively" in circumstances such as those present here. Following *Opati*, this Court has awarded such punitive damages. *E.g. Christie v. Islamic Republic of Iran, supra*, 2020 U.S. Dist. LEXIS 116378 at *93. There, the Court awarded punitive damages equal to compensatory damages apportioned among the plaintiffs in an amount proportional to their compensatory damages. *See also*, *Blank*, 2021 WL 3021450 at * 10. Plaintiffs here should be awarded the same measure of punitive damages.

**VIII.    Plaintiffs are Entitled to Awards of Prejudgment Interest**.

In *Christie*, this Court awarded prejudgment interest from the date of the terrorist attack -- June 25, 1996 -- to the date of the judgment rendered. In *Christie*, this Court reasoned as follows: "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations *Oveissi*, 879 F. Supp. 2d at 56. ***In cases like this one, the general practice has been to award prejudgment interest*.**" *Christie*, *supra*, at **62-63 (emphasis added). The Court should do the same here[6].

## CONCLUSION

For all the reasons stated, the Court should take judicial notice of the evidence submitted in the related and/or similar cases cited herein, and should enter a final judgment against Defendant Iran and in favor of each plaintiff in the amounts set out above, awarding compensatory damages, punitive damages, and prejudgment interest.

Dated: May 11, 2022.                                    Respectfully submitted,

                                                    _/s/ Asher Perlin_____
                                                    Asher Perlin
                                                    LAW OFFICE OF ASHER PERLIN
                                                    Bar I.D. FL0006
                                                    4600 Sheridan Street, Suite 303
                                                    Hollywood, Florida 33021
                                                    786-233-7164
                                                    asher@asherpelin.com
                                                    *Attorney for Plaintiffs*

---

[6] "The appropriate interest rate is calculated using the prime rate for each year between the time of the attack and the entry of judgment. *Christie v. Islamic Republic of Iran*, No. CV 19-1289 (BAH), 2020 WL 3606273, at *20 and n. 15 (D.D.C. July 2, 2020) (providing precise guidance for calculating the rate to be applied).